UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ x
PHILIP BALDWIN,

                        Plaintiff,

           -against-

COMMISSIONER OF SOCIAL SECURITY,

                        Defendant.
------------------------------------------------------------ x

**REPORT AND
RECOMMENDATION**

12 Civ. 08498 (NSR)(JCM)

To the Honorable Nelson S. Román, United States District Judge:

      Plaintiff Philip Baldwin ("Plaintiff"), *pro se*, commenced this action on November 19, 2012 pursuant to 42 U.S.C. § 405(g) (part of the Social Security Act (the "Act"), challenging the Social Security Administration's ("SSA") denial of his application for disability benefits. (Complaint[1]).  Plaintiff seeks a reversal of the SSA's denial or a remand for reconsideration. (*Id.*).  Defendant Commissioner of Social Security ("Defendant Commissioner" or generally, "Commissioner") answered the Complaint on November 18, 2013, contending in part that the "findings of fact of the Commissioner are supported by substantial evidence, conclusive, and in accord with applicable laws and regulations." (Answer[2] at ¶ 10).  On January 15, 2014, Defendant Commissioner moved for an order pursuant to Rule 12(c) of the Federal Rules of Civil Procedure affirming the Commissioner's decision and dismissing the complaint. (Docket No. 21[3]).  Plaintiff did not file any papers in opposition.  For the reasons set forth below, I

---

[1] Refers to the complaint filed in this action on November 19, 2012. (Docket No. 2).

[2] Refers to the answer filed in this action on November 18, 2013. (Docket No. 15).

[3] Refers to the Defendant Commissioner's Notice of Motion filed in this action on January 15, 2015.

respectfully recommend that Defendant Commissioner's motion for judgment on the pleadings should be denied and the case should be remanded.

## I. BACKGROUND

### A. Procedural Background

Plaintiff filed for Supplemental Security Income (SSI) benefits on or about March 26, 2009. (R.[4] 189, 190).  He claimed disability, alleging he had not been able to work since October 1, 2007. (R. 179, 186).  The SSA denied Plaintiff's application on April 26, 2009, concluding that Plaintiff had "resources worth more than $2,000.00 for March 2009 on," thus rendering him ineligible for SSI. (R. 25).  On November 2, 2009, Plaintiff requested a hearing. (*See* R. 35) (SSA's Request for Hearing by Administrative Law Judge Summary, noting Plaintiff's request). Plaintiff asserted that he no longer had the alleged resources, (R. 31), and contended that the SSA bore the burden to prove his resources, (R. 35).  Administrative Law Judge ("ALJ") Mark Solomon ("ALJ Solomon") conducted a hearing on October 15, 2010. (R. 878-906).  Scott Stamper, Esq. represented Plaintiff at the hearing. (R. 880).  Prior to issuing a decision, the ALJ proposed including the results of Plaintiff's state psychiatric consultative examination. (R. 765). ALJ Solomon invited Plaintiff to comment on the additional evidence and advised that he could request a supplemental hearing. (*Id.*).  Plaintiff did not respond.

ALJ Solomon issued a Decision on February 23, 2011 ("Decision"), concluding that Plaintiff had resources in excess of $2,000.00, thereby precluding Plaintiff from SSI eligibility. (R.21-23).  Plaintiff timely requested that the Appeals Council review the ALJ's Decision. (R. 14, 16-17).  Attorney Montel Cherry ("Mr. Cherry") represented Plaintiff for the appeal. (*See* R. 13) (SSA noting Appeals Council considered Mr. Cherry's letter brief); (R. 223-27) (Mr.

---

[4] Refers to the certified administrative record of proceedings ("Record") related to Plaintiff's application for social security benefits, filed in this action on November 18, 2013. (Docket No. 17).

Cherry's letter brief in support of Plaintiff's appeal).  In part, Plaintiff asked that the Appeals Council consider new evidence supporting his position that he did not have excess resources. (R. 225).  Plaintiff, for the first time, requested assistance in obtaining a "police report filed by the bank where the alleged excess resources were held, [because] the bank refused to submit a copy of the report without a subpoena from the ALJ." (R. 225).  Plaintiff also requested that the Appeals Council consider new evidence of his mental impairments, "which were so severe and extreme, that [he] legitimately had no idea where the excess resource came from, and where they were spent." (*Id.*) (alteration provided).  He further alleged that the ALJ failed to properly assess his credibility. (R. 225-26).  On September 27, 2012, the Appeals Council denied Plaintiff's request for review, concluding that Plaintiff failed to demonstrate that he did not have resources in excess of $2,000.00. (R. 5-9).  Thus, the SSA's denial became final.

Thereafter, Plaintiff commenced this action *pro se* on November 19, 2012, seeking a reversal of the SSA's determination or a remand to the SSA for reconsideration of the evidence. (Complaint).  In part, Plaintiff contended that "he was unaware of his resources due to his mental incapacities." (*Id.* at ¶ 5).  On January 15, 2014, Defendant Commissioner moved for a judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, contending that ALJ Solomon's decision should be affirmed and Plaintiff's Complaint should be dismissed. (Docket Nos. 21).  Defendant Commissioner asserted that substantial evidence in the record supported the ALJ's decision and that the ALJ applied the correct legal standards. (Docket No. 22[5]).  Plaintiff did not oppose Defendant Commissioner's motion. (Docket *passim*).  The Court held a conference on February 10, 2015, in part, to provide *pro se* Plaintiff the opportunity to assert oral opposition to the motion. (*See* Docket No. 23).  However, Plaintiff failed to appear.

[5] Refers to the Memorandum of Law in Support of the Commissioner's Motion for Judgment on the Pleadings, filed in this action on January 15, 2014.

(Minute Entry of Feb. 10, 2015). The undersigned's Chambers also attempted to reach Plaintiff by telephone by calling the number he provided in the Complaint. The number appeared to be correct because the voicemail greeting included Plaintiff's name. Plaintiff did not return the Court's voicemail message. Moreover, the one time a male answered Plaintiff's telephone, the person denied being Plaintiff.

**B. Evidence Before the SSA**

The Record includes Plaintiff's bank records, psychiatric and other medical records and testimony. The Appeals Council also considered a letter brief submitted by Plaintiff's attorney, Mr. Cherry. (R. 9).

**i. Medical Evidence**

Plaintiff released to SSA medical records from Gracie Square Hospital ("Gracie Square"), New York Presbyterian Hospital, South Bronx Mental Health Council, Inc. ("SBMHC") and Ryan Nena Community Health Center ("Nena CHC"). (R. 192-215, 228-468, 475-679). The records covered from December 27, 2007 through January 31, 2011. (*Id.*). Nena CHC also submitted a Psychiatric Report in connection with Plaintiff's application for disability benefits. (R. 680-91). Following the hearing, Plaintiff participated in a state consultative examination, which resulting report became a part of the Record. (R. 216-22).

Plaintiff's records from Gracie Square indicate that he has had multiple psychiatric hospitalizations. (R. 202); (*see* R. 473) (noting various hospitalizations). He had been discharged from Gracie Square on December 2, 2007, but returned on December 27, 2007. (*Id.*). The records indicate that Plaintiff suffers from paranoia, anxiety and suicidal thoughts. (R. 200). He also has left eye blindness. (R. 203). Plaintiff continued with out-patient care at SBMHC. (R. 448). SBMHC characterized Plaintiff as having a "serious psychiatric disorder." (R. 498). It

diagnosed him with, among other things, schizophrenia, paranoid type. (R. 499).  In its

Psychiatric Report, Nena CHC concluded that Plaintiff's "prognosis is not good." (R. 683).

Michael Alexander, PH.D. ("Dr. Alexander") conducted the state consultative

examination on December 20, 2010.  Based on his observations and Plaintiff's history, Dr.

Alexander found that Plaintiff had "longstanding psychiatric problems which do not significantly

interfere with [his] ability to function on a daily basis." (R. 218) (alteration provided).  He

diagnosed Plaintiff with schizoaffective disorder. (*Id.*).  Dr. Alexander's prognosis for Plaintiff

was "good" and he concluded that Plaintiff "will be able to manage his own funds." (R. 219).

**ii. Bank Records**

In connection with his application for SSI, Plaintiff signed authorizations for the SSA to

obtain bank records from Bank of America and Marathon National Bank of New York. (R. 145-

56).  It appears that the SSA only asked for records through March 2009. (R. 147, 150, 156); (*see

also* R. 25) (Plaintiff had to demonstrate he had no more than $2,000.00 in resources from March

2009 forward in order to be eligible for SSI).  The SSA received Bank of America bank

statements for a checking account, money market savings account and certificates of deposit

("CD"). (R. 54-125, 142, 708-64, 767-79, 809-77).  Notably missing from the records are

statements from June 26, 2008 through June 1, 2009.

Plaintiff's March 28, 2007-April 25, 2007 statement reflected a total deposit account

balance of $19,792.46, (R. 91, 708, 809), and a CD balance of $59,980.31, (R. 92, 709, 810).

Plaintiff's April 26, 2007-May 25, 2007 statement reflected a total deposit account balance of

$18,794.27, (R. 96, 714, 815), and a CD balance of $60,224.83, (R. 97, 715, 816).  Plaintiff's

May 26, 2007-June 26, 2007 statement reflected a total deposit account balance of $16,963.91,

(R. 102, 720, 821), and a CD balance of $60,478.53, (R. 103, 721, 822).  Plaintiff's September

26, 2007-October 26, 2007 statement reflected a total deposit account balance of $21,887.02, (R. 108, 726, 827), and a CD balance of $49,498.70, (R. 109, 727, 828). Plaintiff's October 27, 2007-November 27, 2007 statement reflected a total deposit account balance of $17,722.66, (R. 114, 732, 833), and a CD balance of $49,704.28, (R. 115, 733, 834). Plaintiff's November 28, 2007-December 26, 2007 statement reflected a total deposit account balance of $15,385.48, (R. 120, 738, 839), and a CD balance of $49,904.05, (R. 121, 739, 840). Plaintiff's December 27, 2007-January 28, 2008 statement reflected a total deposit account balance of $13,795.03, (R. 54, 746, 847), and a CD balance of $50,111.01, (R. 55, 747, 848). Plaintiff's January 29, 2008-February 26, 2008 statement reflected a total deposit account balance of $9,194.63, (R. 60, 752, 853), and a CD balance of $50,318.57, (R. 61, 753, 854). Plaintiff's February 27, 2008-March 26, 2008 statement reflected a total deposit account balance of $7,142.77, (R. 66, 758, 859), and a CD balance of $50,513.53, (R. 67, 759, 860). Plaintiff's March 27, 2008-April 25, 2008 statement reflected a total deposit account balance of $24,981.96, (R. 73, 767, 867), a CD balance of $30,731.56 and an annuity credit totaling $25,000.00, (R. 74). Plaintiff's April 26, 2008-May 27, 2008 statement reflected a total deposit account balance of $22,039.63, (R. 79, 768, 868), CD balance of $30,793.93 and annuity credit totaling $25,000.00, (R. 80,769, 869). Plaintiff's May 28, 2008- June 25, 2008 statement reflected a total deposit account balance of $19,071.78, (R. 86, 775), CD balance of $30,858.55 and annuity credit totaling $25,000.00, (R. 87, 776). A June 2, 2009 statement reflected that Plaintiff had $71.19 remaining in his money market account. (R.142).

### iii.  Testimony

Plaintiff appeared at a hearing on October 15, 2010 with counsel. (R. 880). ALJ Solomon advised Plaintiff and counsel that he would first review the determination that Plaintiff

had excess resources and would only address the issue of disability if appropriate. (R. 881).

Thus, ALJ Solomon questioned Plaintiff about his background, psychiatric condition and

resources, (R. 882-94), and Plaintiff's attorney further questioned him about his living

arrangements and bank accounts, (R. 894-99).

Plaintiff testified that he worked full-time until in or around 1988. (R. 883). At the time

of the hearing, however, he worked only four (4) hours per week as a part-time indoor

messenger, making $30.00 per week. (*Id.*). Plaintiff advised that he received food stamps and

public assistance in the amount of $75.00 every two (2) weeks. (R. 886). He first became

homeless in 2006, and began living in a rooming house in the Bronx. (R. 895). Plaintiff had

health insurance and paid his own premiums until June of 2008. (R. 893-94).

Plaintiff further testified about his medical condition. He stated that he starting treating

his psychiatric condition in 1982, which included taking medication. (R. 884). Plaintiff testified

that his condition worsened in 2007, when he became very depressed and attempted to commit

suicide. (*Id.*). Nonetheless, Plaintiff testified that he took care of his personal needs, including

bathing and dressing. (R. 886). He also stated that he could travel by himself. (R. 888-89).

However, he admitted to having difficulty interacting with other people because he is

"withdrawn and shy." (R. 888).

At the time of the hearing, Plaintiff stated that for about eight (8) months he had been

living in a supportive residence for people with a history of psychiatric condition and

homelessness. (R. 886). The residence largely prepared meals for him. (R. 887). However,

Plaintiff testified that he occasionally helped with meal preparation as part of his chores

requirement. (*Id.*). Plaintiff also testified that he participated with Fountain House, a "club" for

people with a history of psychiatric illness, where he worked in the horticulture department. (R. 887).

ALJ Solomon initiated questioning about Plaintiff's bank records by stating that the last records made available to the SSA were dated June of 2008 and showed a balance of $76,000.00. (R. 889). The ALJ asked Plaintiff to describe what happened to that money. (*Id.*). Plaintiff responded:

> First of all, if I may correct you, the bank said I had $144,000. And that's a totally bogus figure. I inherited about $125,000 in the mid-'90s. I spent that until about 2009 when I had ran out completely. As to the $76,000, I have very little recollection of what – how I spent my money, but I can say that I did – I was living with a woman who I believe helped herself considerably to my cash.

(R. 889-90). Plaintiff continued by stating that he had given his bank card and personal ID number to that woman. (R. 890). He further alleged that she may have forged some checks. (*Id.*). Plaintiff testified that he did not contact the police regarding the alleged theft and forgeries. (R. 893).

Plaintiff stated that he lived with this woman, his girlfriend, from around December 2008 to March 2009. (R. 891). He paid rent in the amount of $1,000.00 per month. (R. 896). He also paid for the couple's food, including dining at expensive restaurants. (R. 897). At that time, he had not been receiving, and therefore reviewing, his bank statements. (R. 892). Plaintiff could not recall when he realized no longer had any money, but was aware that the money was "going down very quickly." (R. 898). Plaintiff testified that he ceased living with the woman after she assaulted him. (R. 899).

## C. Decision of the ALJ

In order to assist him in issuing a decision, at the conclusion of Plaintiff's hearing, ALJ Solomon asked Plaintiff to produce bank records demonstrating what happened to the

$76,000.00 following June of 2008. (R. 900).  ALJ Solomon offered to issue a subpoena if Plaintiff or his counsel needed assistance obtaining this information. (R. 904).  He also requested complete psychiatric medical records and advised Plaintiff that he would need to submit to a state consultative examination for psychiatric evaluation. (R. 900-01).  Plaintiff's counsel also intended to file a memorandum of law in support of Plaintiff's application for SSI. (R. 901, 905).

On February 23, 2011, ALJ Solomon issued a written decision denying Plaintiff's SSI application SSI. (R. 21-23).  The ALJ concluded that Plaintiff failed to meet his burden to establish that he spent down his resources and, thus, was ineligible for SSI. (R. 23).  In rendering his decision, ALJ Solomon evaluated Plaintiff's bank statements and testimony. (R.22).  ALJ Solomon expressly found Plaintiff not credible with regard to his available resources, stating: "[w]hile recognizing that the claimant may have some mental limitations, I do not find his testimony credible.  There is absolutely no proof other than the claimant's unsupported testimony that he did not spend the money himself, or that he does not still have access to much of the money." (R. 22-23).  ALJ Solomon also noted that despite having requested "all treatment records and bank records subsequent to June 2008, as well as a memo of law," neither Plaintiff nor his attorney submitted these items. (R. 23).  Because the ALJ concluded that Plaintiff was ineligible for SSI based on excess resources, he did not address the issue of disability. (R. 23).

## II. DISCUSSION

### A.  Standard of Review

When reviewing an appeal from a denial of Social Security benefits, the Court's review is limited to an inquiry into whether there is substantial evidence to support the Commissioner's decision and whether the correct legal standards were applied. 42 U.S.C § 405(g); *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008) (quotation marks and citation omitted); *see also*

*Richardson v. Perales*, 402 U.S. 389, 401 (1971).  The Court does not substitute its judgment for the agency's, "or determine *de novo* whether [the claimant] is disabled." *Cage v. Comm'r of Soc. Sec.,* 692 F.3d 118, 122 (2d Cir. 2012) (alteration in original) (quotation marks and citations omitted).  If the findings of the Commissioner are supported by substantial evidence, they are conclusive. 42 U.S.C § 405(g); *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996).

Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Perales*, 402 U.S. at 401.  The substantial evidence standard "is still a very deferential standard of review—even more so than the 'clearly erroneous' standard.  The substantial evidence standard means once an ALJ finds facts, we can reject those facts only if a reasonable factfinder would *have to conclude otherwise.*" *Brault v. SSA*, 683 F.3d 443, 448 (2d Cir. 2012) (emphasis in the original) (quotation marks and citations omitted).  "If evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld." *McIntyre v. Colvin*, 758 F.3d 146, 149 (2d Cir. 2014) (citation omitted).  This is so, as even if there is evidence on the other side, the court defers "to the Commissioner's resolution of conflicting evidence." *Cage*, 692 F.3d at 122 (citation omitted).  On the other hand, where the proper legal standards have not been applied and "might have affected the disposition of the case, [the] court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the ALJ.  Failure to apply the correct legal standards is grounds for reversal." *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (alteration provided) (quotation marks and citation omitted).

**B.  Excess Resources**

SSI benefits are need-based for eligible individuals. *Nicolae v. Barnhart*, No. 04 Civ. 2068, 2005 WL 715929, at *1 (E.D.N.Y. Mar. 28, 2005) (citing 42 U.S.C § 1382(a)), *aff'd sub nom. Nicolae v. Comm'r of Soc. Sec.*, 155 F. App'x 558 (2d Cir. 2005).[6]  An "eligible individual" is defined as someone who is "aged, blind, or disabled" and whose resources do not exceed a statutory amount. 42 U.S.C § 1382(a); *Horowitz v. Barnhart*, 29 F. App'x 749, 752 (2d Cir. 2002).  For an individual, the resources amount cannot exceed $2,000.00. 42 U.S.C. § 1382(a)(1)(B), (a)(3)(B); *Horowitz*, 29 F. App'x at 752.  "Resources" are defined as "cash or other liquid assets . . . that an individual owns and could convert to cash to be used for his or her support and maintenance" and include, for example, checking and savings accounts. 29 C.F.R. § 416.1201(a)-(b).  The guiding factor in concluding that an asset is a resource is if "the individual has the right, authority or power to liquidate the property." *Id.* § 416.1201(a)(1).  This limitation on resources is "to ensure that, when determining an individual's SSI eligibility, any assets and other funds readily available to that person for support and maintenance should be applied towards those purposes." *Frerks by Frerks v. Shalala*, 848 F. Supp. 340, 349 (E.D.N.Y. 1994), *aff'd Frerks v. Shalala*, 52 F.3d 412, 414 (2d Cir. 1995).

A claimant has the burden to produce credible evidence that he or she does not have excess resources and is therefore eligible for SSI benefits. *See Dumas v. Schweiker*, 712 F.2d 1545, 1550 (2d Cir. 1983) (citing, in part, 42 U.S.C. § 423(d)(5)) ("The claimant bears the ultimate burden of proving that he is disabled.").  Even if a claimant's application is denied due to excess resources, such claimant "can, nonetheless, be determined to be eligible if, prior to the

---

[6] In accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009), and Local Rule 7.2 of the Local Civil Rules of the United States District Courts for the Southern and Eastern Districts of New York, a copy of this case and any others cited herein, only available by electronic database, accompany this Report and Recommendation and shall be simultaneously delivered to *pro se* Plaintiff.

hearing decision, he or she establishes by credible evidence that those resources have been 'spent down,' that is, that any excess above the resource limit has been eliminated." *Nicolae*, 2005 WL 715929, at *1. However, eligibility determinations cannot be made solely on self-made declarations by the applicant. 42 U.S.C. § 1383(e)(1)(B); *see Nicolae*, 2005 WL 715929, at *3 ("an ALJ must be free to disregard self-serving statements that cannot be verified"). "[R]elevant information will be verified from independent or collateral sources and additional information obtained as necessary in order to assure that such benefits are only provided to eligible individuals." 42 U.S.C. § 1383(e)(1)(B) (alteration provided). Moreover, when "determining whether a claimant has spent or retained excess resources, . . . the ALJ's assessment of credibility must be given great weight." *Nicolae*, 2005 WL 715929, at *3.

**C. Determination of Benefits**

After reviewing the evidence of Plaintiff's resources, ALJ Solomon determined that Plaintiff's resources exceeded $2,000.00. (R. 23). He also found that Plaintiff's testimony about how his money was spent was not credible. (R. 22-23). ALJ Solomon made this conclusion, in part, based upon Plaintiff's failure to alert the authorities about the alleged theft of his money. (R. 23). ALJ Solomon noted that Plaintiff "may have some mental limitations," but did not cite to any medical records, statutes, regulations or case law on this issue. (R. 22). ALJ Solomon further found that Plaintiff failed to meet his burden of proof regarding how his money was spent. (R. 23). Thus, the ALJ affirmed the SSA's denial of Plaintiff's application for SSI.

The crux of Plaintiff's dispute with the SSA's denial of benefits is his belief that the SSA had the burden to prove whether his resources exceeded $2000.00. However, the amount of resources in plaintiff's possession directly relates to his eligibility to receive SSI in the first instance. 42 U.S.C. § 1382(a). It remains Plaintiff's burden to prove eligibility to receive SSI.

*See* 42 U.S.C. § 423(d)(5)(A) ("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof"); 20 C.F.R. § 404.1516 ("If you do not give us the medical and other evidence that we need and request, we will have to make a decision based on information available in your case."); *Schauer v. Schweiker*, 675 F.2d 55, 58 (2d Cir. 1982) (citations omitted) ("when a claimant applies for disability benefits the burden is on the claimant to establish disability").

Nonetheless, isolating the dispute in terms of burden of proof is misleading.

When we speak of the burden of proof in a social security disability benefits proceeding . . . we are not concerned with which party should prevail on a given issue when there is evidence "adequate to support" both the affirmative and the negative of the factual proposition. Rather, we are concerned with which party should prevail when neither the affirmative nor the negative of the proposition is supported by "substantial evidence."

*Id.* at 57. This, in turn, speaks to the very nature of social security benefits determinations. Because they are not adversarial, typically the ALJ has an obligation to develop the record. *Echevarria v. Sec'y of Health & Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982) (citations omitted) (the Commissioner "is not represented, and the ALJ, unlike a judge in a trial, must himself affirmatively develop the record"). This obligation exists regardless of whether the claimant is counseled or *pro se*, and it arises under the regulations setting forth the SSA's responsibility to affirmatively obtain medical records. 20 C.F.R. § 404.1512(d).

However, the SSA's Program Operations Manual System ("POMS") also directs the SSA to assist claimants in obtaining evidence. POMS GN 00301.180. This is so even though POMS states that it is a claimant's responsibility to provide "the necessary information, documents, or evidence to prove that the requirements for SSI eligibility are met." POMS SI 00601.100(B)(2)(b). POMS expressly states, "There are instances when a claimant cannot adequately handle obtaining evidence due to factors beyond his or her control." POMS GN

00301.180(B).  One such instance is when a claimant "has a mental or physical condition, which severely interferes with his or her ability to be independent (e.g., advance senility or severe emotional disturbance). *Id.* POMS directs that the "SSA must offer assistance to claimants/recipients and interested third parties in obtaining information/evidence needed to determine the claimant's eligibility and/or payment amount.  The offer should be made during the initial contact with the individual and all subsequent contacts that involve requests for additional information." POMS SI 00601.100(B)(1)(b).  POMS directs the SSA to take several steps in obtaining information and evidence, including: "Assist the claimant . . . in obtaining necessary information/evidence from third parties, if the individual is having difficulty (e.g., homeless individuals)." POMS SI 00601.100(C).

Although POMS is a guidance manual to interpret the SSA regulations and it is "without the force of law, [it is nonetheless] entitled to be given weight." *St. Mary's Hosp. of Troy v. Blue Cross &Blue Shield Ass'n/Blue Cross & Blue Shield of Greater N.Y.*, 788 F.2d 888, 890 (2d Cir. 1986) (alteration provided) (citation omitted).  Here, it is not clear from the record that the SSA followed the guidelines set forth in POMS and, thus, whether it followed the proper legal standards with regard to obtaining all of the necessary evidence to complete the Record.  The ALJ expressly deferred addressing Plaintiff's psychiatric condition[7] rather than determining what effect, if any, it had on Plaintiff's ability to obtain the necessary information. (*See* R. 22-23, 881).  The ALJ also expressly left it to Plaintiff's devices to obtain missing bank records despite the fact that Plaintiff was homeless. (R. 886, 895, 900).  Moreover, Plaintiff's counsel informed

---

[7] Despite the state consultative examiner's findings and conclusions minimizing Plaintiff's condition, his treating physicians indicate Plaintiff has a significant psychiatric condition. (R. 498-99, 683).  Thus, absent other evidence contradicting the treating physician's opinions, Plaintiff's limits should have been considered. *Rosa v. Callahan*, 168 F.3d 72, 81 (2d Cir. 1999) (citation omitted) (the Second Circuit "has refused to uphold an ALJ's decision to reject a treating physician's diagnosis merely on the basis that other examining doctors reported no similar findings").

the Appeals Counsel that despite "several attempts by counsel and [Plaintiff] to obtain the police report filed by the bank where the alleged excess resources were held, the bank refused to submit a copy of the report without a subpoena from the ALJ." (R. 225). These factors seem to require the SSA to have assisted Plaintiff more than it did to establish the status of his resources. *See* POMS SI 00601.100(B)(1)(b), (C); POMS GN 00301.180(B).

For this reason, it is respectfully recommended that this case be remanded to the Commissioner to review the application of POMS' policies with regard to this Plaintiff and to obtain any documentation the bank may have relating to Plaintiff's contention that the money was stolen. *See Pollard v. Halter*, 377 F.3d 183, 188-89 (2d Cir. 2004) (quoting *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir.1984)) ("'[w]here an error of law has been made that might have affected the disposition of the case, this court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the ALJ'").

## III. CONCLUSION

For the foregoing reasons, I conclude and respectfully recommend that the Defendant Commissioner's motion for judgment on the pleadings should be denied and the case should be remanded.

## IV. NOTICE

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b)(2) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from receipt of this Report and Recommendation to serve and file written objections. If copies of this Report and Recommendation are served upon the parties by mail, the parties shall have seventeen (17) days from receipt of the same to file and serve written objections. *See* Fed. R. Civ. P. 6(d). Objections

and responses to objections, if any, shall be filed with the Clerk of the Court, with extra copies delivered to the Chambers of the Honorable Nelson S. Román at the United States District Court, Southern District of New York, 300 Quarropas Street, White Plains, New York, 10601, and to the Chambers of the undersigned at said Courthouse.

Requests for extensions of time to file objections must be made to the Honorable Nelson S. Román and not to the undersigned. Failure to file timely objections to this Report and Recommendation will preclude later appellate review of any order of judgment that will be rendered. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(b), 6(d), 72(b); *Caidor v. Onondaga County*, 517 F.3d 601, 604 (2d Cir. 2008).

Dated:   November 24, 2015
          White Plains, New York

**RESPECTFULLY SUBMITTED,**

JUDITH C. McCARTHY
United States Magistrate Judge

2005 WL 715929, 103 Soc.Sec.Rep.Serv. 181

2005 WL 715929
United States District Court,
E.D. New York.

Cornel NICOLAE, Plaintiff

v.

Jo Anne B. BARNHART, Commissioner
of Social Security, Defendant.

No. 04-CV-2068 (FB).   |   March 28, 2005.

**Attorneys and Law Firms**

Cornel Nicolae, pro se, Flushing, NY, for Plaintiff.

Roslynn R. Mauskopf, Esq., United States Attorney, Eastern
District of New York, by Timothy D. Lynch, Esq., Assistant
U.S. Attorney, Brooklyn, NY, for Defendant.

### MEMORANDUM AND ORDER

BLOCK, District Judge.

**\*1** Plaintiff Cornel Nicolae ("Nicolae") brings this action
challenging the final decision of the Commissioner of
Social Security ("Commissioner") finding him ineligible
for supplemental security income ("SSI") benefits. The
Commissioner moves for judgment on the pleadings pursuant
to Fed.R.Civ.P. 12(c). Nicolae also moves for judgment on
the pleadings and submits additional evidence in support
of his motion. For the reasons set forth below, the
Commissioner's motion is granted and Nicolae's motion is
denied.

### I.

The administrative record ("A.R.") before the Court shows
that Nicolae was granted SSI benefits in July 1999. A.R.
12. In January 2001, the Social Security Administration
requested that he provide information regarding certain bank
accounts held by his wife, Georgetta Nicolae ("Georgetta");
subsequently, he was determined to be ineligible for SSI
because their combined resources exceeded the $3,000 limit
established by 42 U.S.C.A. § 1382. A.R. 29-30, 33-34.
He requested reconsideration, which request was denied,
A.R. 39, 40-42, and then requested a hearing before an
administrative law judge ("ALJ"). A.R. 43.

### A. Statutory and Regulatory Overview

Unlike social security disability ("SSD") benefits, for which
there are no income or resource limitations, SSI is a needs-
based program; thus, a claimant who is medically eligible for
SSI must further establish a financial need to qualify. [1] See 42
U.S.C.A. § 1382(a). For an individual who lives with a
spouse, the individual's resources are "deemed to include any
resources ... of such spouse whether or not such resources
are available to such individual." 20 C.F.R. § 416.1202. The
combined resources of the claimant and his cohabiting spouse
must total no more than $3,000. See 42 U.S.C.A. § 1382(a)(3)
(A). A claimant whose application was denied because his or
her resources exceeded the $3,000 limitation at the time of the
application can, nonetheless, be determined to be eligible if,
prior to the hearing decision, he or she establishes by credible
evidence that those resources have been "spent down," that is,
that any excess above the resource limit has been eliminated.
See Hudson v. Bowen, 849 F.2d 433, 434 (9th Cir.1988); see
also 20 C.F.R. § 416.330 (providing that an application for
SSI benefits "remain[s] in effect" until a "hearing decision"
is issued, and that the applicant can become eligible if he
or she "meet[s] all the requirements for eligibility while the
application is in effect[.]").

Generally, funds held in a financial institution are considered
a resource for purposes of determining SSI eligibility. See 20
C.F.R. § 416.1208(a). Thus, if a claimant's cohabiting spouse
(the "deemor") [2] is the sole owner of a financial-institution
account and can "withdraw funds and use them for his or
her support and maintenance, all of the funds, regardless of
their source, are that individual's resource." Id. § 416.1208(b).
There is a non-rebuttable presumption that all of the funds in
such an account belong to the deemor. See id. If an account
is jointly held and none of the holders is an SSI claimant
or recipient, there is a rebuttable presumption that all of
the funds in the account belong to the deemor. See id. §
416.1208(c)(2). To rebut this presumption, the deemor must
(1) submit "a statement, along with corroborating statements
from other account holders, regarding who owns the funds
in the joint account, why there is a joint account, who has
made deposits to and withdrawals from the account, and how
withdrawals have been spent"; (2) submit "account records
showing deposits, withdrawals, and interest (if any) in the
months for which ownership of funds is at issue"; and (3)
correct the account title to show proper ownership. See id. §
416.1208(c)(3)-(4).

Nicolae v. Barnhart, Not Reported in F.Supp.2d (2005)
2005 WL 715929, 103 Soc.Sec.Rep.Serv. 181

## B. The Evidence Before the ALJ

  **\*2**  A hearing was held before the ALJ on November 26, 2002, at which Nicolae was not represented by an attorney. He testified and that from 1990 to 1999, he and Georgetta lived apart, but that he resumed living with her in September 1999. A.R. 191. However, in a March 7, 2001 letter, he wrote that they resumed living together in June 1999. A.R. 258.

Bank records showed that as of July 1, 1999, the balance in Georgetta's checking account was $10,676.88. A.R. 134. Additionally, the balance in an account she held jointly with her daughter, Lavinia Nicolae ("Lavinia"), was $2,385. A.R. 134. As of October 26, 1999, the combined balance of the two accounts exceeded $9,800. A.R. 137, 138, 141. After October 1999, the combined balance of the accounts was less than $3,000, except that in December 2000, Georgetta deposited approximately $6,000 in the shared account, which amount she withdrew in January 2001. A.R. 177, 179. Tax records show that from 1999 to 2001, Georgetta's annual adjusted gross income was, on average, approximately $8,000. A.R. 229-43.

With respect to the use of the funds in Georgetta's accounts, Nicolae testified that at some point in 1999, she gave their son Florin Nicolae ("Florin") $7,000 for his wedding reception and $3,000 for his honeymoon. A.R. 271. In an April 9, 2001 statement, Florin wrote that from June 1998 to June 1999, Georgetta gave him $10,000 for his wedding and honeymoon. A.R. 192-93. Nicolae did not produce any receipts related to the wedding.

In an April 21, 2001 statement, Mariana Sulu ("Sulu"), a friend of Georgetta's, wrote that on November 1, 1999, Georgetta gave her a check for $5,000 in repayment of a loan. The record includes a cancelled check for $5,000 from that date, which was made out to cash.

Nicolae testified that at some point in 1999, Georgetta gave Lavinia $10,000, which had been deposited in Georgetta's account from a grant for Lavinia's Ph.D. program. A.R. 279-80. In an undated letter, Lavinia wrote that in August 1999, Georgetta had given her $1,300 for rent. A.R. 71. In a second undated letter, she wrote that she had received a research grant of $6,247 from the Institute for International Education ("IEE"), which she deposited in the joint account she shared with Georgetta in November 2000, and then withdrew in December 2000. A.R. 72. In another undated letter, Lavinia reported that in 2001 she had also received a $3,000 fellowship grant from the IEE, which she deposited in

her mother's account. A.R. 233. An April 11, 2001 letter from the IEE to Florin explained that, as the individual designated to receive grant checks on behalf of Lavinia, he was being sent a check for $3,000. A.R. 73.

## C. ALJ's Decision

In an April 18, 2003 decision, the ALJ found that when Nicolae filed his application for benefits in July 1999, he was living with Georgetta. A.R. 17. In doing so, the A.L.J. found that Nicolae's testimony that he did not resume living with her until September 1999 was "not credible" because in his March 7, 2001 letter, Nicolae had written that they resumed living together in June 1999. Applying the regulations, the ALJ concluded that Georgetta's resources should be "counted as" Nicolae's. A.R. 16.

  **\*3**  Relying on the bank records, the ALJ found that Georgetta's resources exceeded $3,000 at the time Nicolae applied for benefits. The ALJ noted that "various explanations have been offered regarding the use of the money in [Georgetta's] accounts."A.R. 16. However, these explanations were rejected as being "not supported" and "not credible." A.R. 17. Accordingly, the ALJ found that Nicolae had failed to prove that Georgetta no longer had funds in excess $3,000. *Id.* Based on this finding, the ALJ concluded that Nicolae was not eligible for SSI. A.R. 18.

On March 10, 2004, the Appeals Council denied Nicolae's request for review. This action followed. Thereafter, Nicolae submitted additional evidence to the Court in support of his motion for judgment on the pleadings.[3]

In a March 18, 2005 affidavit, Nicolae explained that he had reapplied for SSI benefits in December 2005, that his application had been granted, and that he is now receiving benefits. *See* Pl .'s Aff. Opp. Def.'s Motion, dated Mar. 18, 2005 at 9-10. However, he still seeks a determination that he was eligible for benefits for the period beginning in July 1999. *See id.*

## II.

## A. Review of the Commissioner's Decision

In reviewing the Commissioner's decision, the Court must determine whether the Commissioner applied the correct legal standard, *see Tejada v. Apfel,* 167 F.3d 770, 773 (2d Cir.1999), and whether the decision is supported

by substantial evidence. *See* 42 U.S.C. § 405(g); *Green-Younger v. Barnhart,* 335 F.3d 99, 106 (2d Cir.2003). Substantial evidence is "more than a mere scintilla [,]" *Calef ex rel. Calef v. Barnhart,* 309 F.Supp.2d 425, 430 (E.D.N.Y.2004)(quotation omitted); rather, "substantial evidence requires enough evidence that a reasonable person might accept as adequate to support a conclusion." *Id.* (quotation omitted).

In determining whether the Commissioner's findings are supported by substantial evidence, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting interferences can be drawn." *Brown v. Apfel,* 174 F.3d 59, 62 (2d Cir.1999). The Court is mindful, however, that "it is up to the agency, and not [the district] court, to weigh the conflicting evidence in the record." *Clark v. Commissioner of Soc. Sec.,* 143 F.3d 115, 118 (2d Cir.1998). Indeed, in evaluating the evidence, "the court may not substitute its own judgment for that of the Secretary, even if it might justifiably have reached a different result upon de novo review." *Jones v. Sullivan,* 949 F.2d 57, 59 (2d Cir.1991) (quotation omitted). Similarly, "in determining whether a claimant has spent or retained excess resources, an ALJ must be free to disregard self-serving statements that cannot be verified, and the ALJ's assessment of credibility must be given great weight." *Hudson,* 849 F.2d at 834.

Having carefully reviewed the administrative record, the Court is satisfied that the ALJ's eligibility determination is supported by substantial evidence, especially as the ALJ's findings were based in large part on an assessment of Nicolae's credibility. The ALJ's finding that as of July 1999 Nicolae was living with Georgetta is supported by Nicolae's March 7, 2001 letter, in which he wrote that he had resumed living with Georgetta in June 1999; thus, the ALJ was warranted in rejecting Nicolae's testimony to the contrary and in deeming Georgetta's resources to Nicolae.

*4 The ALJ's finding that, at the time of Nicolae's application, Georgetta had resources in excess of $3,000 is supported by her bank statements. Those statements show that in July 1999 she had a balance in her checking account of $10,676.88 and a balance in an account held jointly with Lavinia of $2,385.

Substantial evidence similarly supports the ALJ's rejection of Nicolae's explanations regarding the use of those funds subsequent to July 1999. For example, to bolster his testimony

that $5,000 of those funds were used to repay a loan made by Sulu, Nicolae offered Sulu's letter stating that she received payment by check. However, the check that Nicolae alleges was used to repay the loan was made out to cash. Similarly, although Nicolae testified that Georgetta gave Florin $10,000 for his wedding, neither he nor Florin offered any documentation regarding the wedding expenses. Moreover, although the $10,000 was allegedly given to Florin sometime between June 1998 and June 1999, as of October 26, 1999, the funds in Georgetta's accounts exceeded $9,800. Based on such inconsistencies between the documentary evidence and Nicolae's testimony, the ALJ found that his and his family's explanations regarding the use of Georgetta's funds were not credible. As noted, "it is up to the agency, and not [the district] court, to weigh the conflicting evidence in the record." *Clark,* 143 F.3d at 118.

**B. Consideration of Additional Evidence**
The court has the authority to review only the pleadings and record before the Commissioner; it may not consider additional evidence, but may remand the case to the Commissioner upon a showing "that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." *See* 42 U.S.C. § 405(g); *Tirado v. Bowen,* 842 F.2d 595, 597 (2d Cir.1988). Thus, the plaintiff must "show that the proffered evidence is (1) new and not merely cumulative of what is already in the record, and that it is (2) material, that is, both relevant ... and probative." *Lisa v. Secretary of Health and Human Servs.,* 940 F.2d 40, 43 (2d Cir.1991) (quotations omitted). The concept of materiality requires, in addition, "a reasonable possibility that the new evidence would have influenced the [Commissioner] to decide claimant's application differently." *Id.*

With the exception of the court records relating to divorce proceedings commenced by Georgetta, all of the additional materials submitted by Nicolae predate his hearing in November 2002, and he has not shown good cause for his failure to incorporate this evidence in the hearing record. With respect to the records relating to the divorce proceedings, although this is new evidence, it is not material to the ALJ's determination that, at the time of the hearing three years before they were commenced, Nicolae was living with Georgetta. Accordingly, the Court declines to remand for the consideration of additional evidence.

Nicolae v. Barnhart, Not Reported in F.Supp.2d (2005)
2005 WL 715929, 103 Soc.Sec.Rep.Serv. 181

## CONCLUSION

**\*5** For the reasons stated above, the Court denies Nicolae's motion, grants the Commissioner's motion and affirms the decision of the Commissioner.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2005 WL 715929, 103 Soc.Sec.Rep.Serv. 181

Footnotes

1   The Commissioner does not contest that Nicolae is medically eligible for SSI.

2   As defined by the regulations, "[a] deemor is a person whose income and resources are required to be considered when determining eligibility and computing the SSI benefit for an eligible individual [.]"20 C.F.R. § 416.1208(a)(2).

3   In a February 15, 2005 letter, Nicolae stated that certain documents would support his allegation that he did not resume living with his wife until September 2001. *See* Letter from Cornel Nicolae, dated Feb. 15, 2005. Specifically, he stated that utility bills and cancelled rent checks would show that he was still living at his prior address until September 2001, *see id.,* but that he had not obtained copies of these documents because he owes the utility companies and his former landlord money and, therefore, needs to "stay hidden" from these creditors. *Id.* With a March 18, 2005 affidavit, he submitted copies of leases from his prior address, documentation from the IEE showing that Lavinia received a grant of $6,247 in December 2000, bankruptcy court records showing that in April 1993 his debts were discharged, and state court records relating to a divorce proceeding commenced by Georgetta in early 2005. *See* Attachments to Pl.'s Aff. Opp. Def.'s Motion, dated Mar. 18, 2005.

End of Document

© 2015 Thomson Reuters. No claim to original U.S. Government Works.